All right. Our last case for today is PJM Power Providers Group v. Federal FERC and others as well. Numbers 23-1778, 23-1790, 23-1808, 23-1984, 23-2544, 23-2559, 23-2560, and 23-2612. Welcome. We'll be happy to hear from you. Thank you, Your Honor. May it please the Court, my name is Matthew Price on behalf of petitioners. I'd like to reserve four minutes for rebuttal, please. That would be granted. This case involves a FERC-regulated auction, and it's common ground among the parties that the auction procedures themselves, and not just the rate that's set at the end of the auction, are part of the filed rate and subject to the filed rate doctrine. Now, the filed rate doctrine is a fundamental part of the Federal Power Act. Congress understood that to bring about a plentiful supply of electricity at reasonable prices, there needs to be transparency and predictability. And accordingly, utilities, which include PJM, are required to file tariffs, open for public inspection, and they're bound to file their tariffs. And they can change their tariffs, but they can only change their tariffs for the future. And that rule is unbending, even in cases where the result may be inequitable, indeed, even where the tariff is procured by fraud. In the short run, sometimes this rule is good for customers, sometimes this rule is good for suppliers, but in the long run, respecting this rule is good for everybody. This case is an especially clear violation of the rule. PJM went through all the required pre-auction procedures, which were all laid out in detail in its tariff, and these included calculating and posting parameters which are used in the auction and receiving irrevocable binding offers. And then it looked at the outcome that would result from the parameters it posted, the offers it received, and the rules that then governed the auction, and then decided to replace one of the parameters in order to change the outcome. And that is just a clear filed rate doctrine violation. As I understand it, there's about a $100 million delta here, right? That's what the record says, Your Honor. That's right. So doesn't the Federal Power Act entrust the FERC with protecting customers from excessive rates and charges? It does, Your Honor, but the way that— Is there some tension here? Well, no, because the way the Federal Power Act goes about protecting customers from excessive rates and charges is by allowing rates to be changed prospectively. And if you look at Section 205— Were the rates changed prospectively here? Well, they were changed prospectively because, again, the auction procedures themselves are part of the filed rate. The filed rate doctrine includes these auction procedures. The procedures were applied, and then they were undone by tariff changes. That is retroactive under any plain meaning of the term. And the way Congress wanted— How were the rates—I'm a very simple guy. How were the rates changed prospectively? Well, again, I think under the Federal Power Act, Your Honor, rates is a term of art. And if you look at Section 205, what a rate encompasses are numerical rates, but also practices, classifications, and other things affecting numerical rates. All of those are really the rate. And so, I mean, FERC in its brief acknowledges that when you talk about, well, what is PGM's rate, PGM's rate is the collection of procedures set forth in its tariff that govern the auction. And when you think about what an auction is, an auction is simply a set of procedures— I'm a little bit confused. When you're saying prospective, are you saying it should have been prospective? This all should have been prospective? In other words, there should have been the rate that if, according to your argument, everything was followed, it would be prospective because it would set the new rate, right? Well, what I'm saying, Your Honor, is there's an auction like this held every year. Right. And if PGM had looked at this and said, oh, you know, there was a problem in the way these parameters were calculated, we want to fix that, it can fix it for the next auction. That's what I mean by prospective. Okay. It can't fix it for the auction that's already underway where all sorts of procedural deadlines have already passed, where parameters have been publicly posted that the tariff says shall be used in the auction. PGM is stuck with the tariff it has for that auction. It can change it going forward. It will never change it. Even if there's fraud, even if they recognize that there's $100 million overcharges, FERC doesn't have the capacity to make an adjustment. That's the filed rate doctrine, Your Honor. And if you look at those cases, I mean, many of them involve fact patterns that you'd say, wow, that really seems unfair. It's inequitable. But the cases describe it as an impenetrable shield that doesn't yield to equities. And the reason for that, again, is because, you know, if you think about what suppliers are doing, they're in a regulated industry. They're to some extent at the mercy of the regulator. You need to have confidence that the rules that you think are going to govern your decision-making are actually going to govern them. And if you're at the mercy of having things, the rug pulled out from under your legs, after you've already made decisions, after you, you know, have relied on what's publicly posted, you're not going to want to invest. And ultimately, that's bad for customers. So this event, yes, customers are going to pay more. But in the long run, respecting the rules is what's important, because in the long run, that ensures that there's an incentive for suppliers to participate in the market and make these very, very intensive long-term capital investments that are needed to ensure that the lights stay out. But we have examples of other circumstances where the RTO has said, there's a problem here. I'm going to push the pause button in the middle of these procedures that were set forth and published in the tariff in advance and then has gone to the commission and said, look, we need to make an adjustment. And, you know, we've seen that happen to the benefit of the power providers in, for example, the old Dominion case, right, where, like, the actual number was changed. And in that case, like, you could make the same argument, right? So are you saying that, like, you know, contrary to the D.C. Circuit's decision there, that that was a retroactive change in the rules? Well, Your Honor, the old Dominion case actually, I believe, came out the other way. What happened in the old Dominion case is that old Dominion bought a whole bunch of fuel at very high cost. But it was the tariff capped it, capped the amount that it could offer in the auction. As a result, it didn't cover its fuel costs. And it wanted to say, you should allow us to get back the excess fuel costs that we weren't able to recover because we lost a lot of money, and that's not fair. And the result was tough. I mean, you knew what the filed rate was. You have to file the filed rate. Sometimes it helps customers. Sometimes it helps suppliers. The rule cuts both ways. And, yes, our position is the filed rate is what governs, and you can't make exceptions to it because once you begin chipping away at it and making exceptions, the whole edifice falls apart because there's always going to be a temptation to tweak and adjust and make things more fair. But once you start down that path, you simply can't have a set of tariffs that are predictable and transparent that people can look at and know what the rate is. And that's the fundamental problem here. The FERC has allowed, and so despite the 60-day rule that you're supposed to give 60 days notice for change, there are exceptions to that rule. Exceptions have been made. And if the RTO does put a stop to the procedures that have been announced and seek authorization, then from that day forward it can, if approved in a way that is not arbitrary or capricious, it can make changes that are not retroactive. Would you agree with that? I agree with that in part, Your Honor, but let me be very clear about which part I agree with. I agree with that if the things that they want to fix haven't already happened. And I think the problem here is that the thing they want to fix already happened. If you look at the tariff under Section 5.11a, which is on page 8058 of our addendum, it describes posting parameters. Now, parameters are basically key variables that are used to draw the demand curve that's going to be used in the auction. And public posting of those makes sure everybody has the same information and people undertake commercial activity in response to those parameters. The tariff has a very detailed methodology for calculating them. Those were posted on August 29, 2022, 100 days before the auction, consistent with the tariff. After that, they can be changed, but only for reasons that the tariff itself tells you in advance they can be changed for. So there are certain adjustments that can be made. And if you look at 5.11a, you'll see one has to do with this thing called price-responsive demand, and another has to do with essentially the amount of capacity that transmission lines have to take electricity in and out of a zone. Those are the reasons why you can adjust after that date. Unless you get an exception and the commission allows you to make additional, right? I mean, there is a process for – or you're saying that there is no process once that tariff is published initially, that one cannot go to the FERC and say, please let us make a change. Well, you can't make an exception for something that's already passed. That's the whole point of the valid rate doctrine. Yes, you can say, in future years, we're going to change our tariff, and there's going to be a new exception for this thing. But if you say, well, we want an exception to go back and change the thing that's already passed, where the tariff says that's what's going to be used in the auction, no, you can't do that. That's the whole point of the valid rate doctrine. So I think there seems to be a bit of a fact dispute on whether the thing has already passed here, meaning like the running of the algorithm. You know, the FERC and certainly the RTO says, you know, we run, you know, we do all this over and over again. And just because we did it once doesn't mean that that step in the process is in the past. And why is that not correct? Yeah, so let me address that. But I want to make a preliminary point that there are really two things that are passed. The first is the posting of the parameters. That doesn't depend at all on this thing about the algorithm. So I want to make that clear. That's an independent violation of the valid rate doctrine because the tariff says the posted parameters in August are the ones that shall be used in the auction. If you look at addendum 55, 510A6A, that's what it says in black and white. But as to your question about the algorithm, our case doesn't depend on the resolution of the factual dispute. Once the bids were done and FERC began, PGM initiated the optimization algorithm process described in the tariff, at that point PGM had very limited ability under the tariff to rerun the algorithm. The tariff is expressed in defining the circumstances in which PGM is allowed to do that. It can do that to address market power issues. That's in section 6.2B at the FERC appendix 68. It can do it to address price responsive demand or if there's some sort of ministerial error in the initial posting of results. That's 511E at addendum page 59. Those are the reasons why PGM can rerun the algorithm. It doesn't have free reign just to rerun the algorithm for whatever reason it feels like and use different inputs than the inputs that the tariff prescribed. But that's exactly what they did here. And if you look at joint appendix page. You're just following on to Judge Freeman. Does it matter that the final clearing prices weren't published until after the tariff amendment? It doesn't matter. No, because the algorithm is a computer program. I'm talking about just the final clearing prices. The process is at an end and now we know the results are going to be posted. But this is after the amendment. I mean, does it matter? No, it doesn't matter because the point is once the optimization algorithm begins, once that process begins, the tariff prescribes what's supposed to happen. There are, if you look at page, joint appendix page 342, I think this makes it very clear in black, white, and red line. And, you know, we have on page 344, is it? Yeah, 342. These are the constraints in the base residual auction. The optimization algorithm is supposed to respect all these bull points. In black and white, this is how the optimization algorithm is to be run. And some of them say, well, if there are, you know, the market power issue, price responsive demand, those are reasons why, oh, you look at the output, you need to rerun it to fix those problems. What PGM did is added another bullet point of something that it now, this is a new problem that it wants new authority to be able to fix. It had no discretion to rerun the algorithm for that reason before it made its tariff change. And, again, that's retroactive. It's redoing something it had no authority to redo before FERC purported to approve this change. The file break doctrine prohibits that kind of going back in time to claim new authority to do something different than what the tariff prescribed. This is a different sort of questioning. How much deference, if any, do we give the FERC opinion or the FERC order? Well, I don't think in this case there's any deference warranted because I don't think there's any dispute about what the tariff says. I think the tariff is clear. You can read it. We're not really debating that. Our position doesn't depend on the factual issue of, you know, whether the auction was final or not final. Our point is whether it was final or not final, whether the button had been pushed or not pushed, the point is PGM only had a certain limited discretion to do things, and it then retroactively grabbed more discretion, and it can't do that. So I don't think it depends on factual disputes. I think this is a question of pure law. Does the file break doctrine bar this kind of conduct? And we think the answer is clearly yes. And I'd like to reserve, I think this, is this my whole time or just my? What's that? Sixteen. Okay. Okay. So I have a few more minutes. Good. Okay. So can I ask you a question? I couldn't help but notice Commissioner Danley had a fairly strongly worded dissent, too, actually. Do you agree with the content of those dissents? Yes, absolutely. Or are there problems with? I know you agree with the result he wanted to reach. No, I think the analysis is exactly right. I do agree with the content. You know, I would say with respect to the idea that, you know, there's no rate set until the sale is complete for exposition, you know, I think there are a few basic problems with that argument. One is that it is just inconsistent with the idea that the filed rate doctrine encompasses non-rate terms because if you think about an auction, again, it's a set of procedures for determining a rate. Why would you bother having a tariff that lays out all these parameters if you can just go and change it after the fact in order to get a preferred rate outcome in terms of the monetary value? So it just first acknowledgment that the filed rate doctrine encompasses all these non-rate terms, all these procedures, can't be squared with its overly cramped understanding of what the filed rate doctrine protects. The second point I'd make is there's no limiting principle. It would really eviscerate filed rate doctrine protection from auctions. I mean, you couldn't rely on anything that's in the tariff, any of these procedures that, you know, my clients spend enormous amounts of time and energy and expense trying to understand, trying to analyze, and modeling. Very sophisticated analysis goes into trying to formulate bids, to hedge, and FERC is basically saying, no, none of that really matters because we can just change it after the fact. Do your clients allege that their bids would have been different if they had known about this, the change that FERC allowed? Well, two points in response to that. The first point that I think is very important is the filed rate doctrine doesn't depend on reliance. Reliance is not an element. It's not an equitable doctrine. It's derived from the statute. I think that's a very important point because Congress didn't want to have, essentially, many trials on reliance about whether you could follow the filed rate that's publicly posted. Sure, but, I mean, one of the things that the FERC has to consider is whether these are, you know, fair and just or whatever the terms are, and so reliance might factor into that, wouldn't it? Well, the fair and just, or the just and reasonable point, that's for the future auctions. It can consider whether the rules should change for the future, but reliance is irrelevant to whether you have to respect the filed rate that's posted, open to inspection, that's out there for the public to look at. Ultimately, is there any allegation in the record that the actual bids would have been different if they had known about this different? So bidding is a confidential thing, and so I don't believe that there's anyone in the record who said we specifically would have bid a different number. But there is a discussion of, for example, renewable developers who are not required to participate in the auction. They can choose whether to participate, not to participate. They can segment their bids to say we're going to offer 50 megawatts, but the other 50 megawatts we're not going to offer, and there is evidence in the record, and I would point to the Holtman Affidavit at page 477, the Pinegate comments. There is evidence in the record that the Holtman Affidavit at Joint Appendix 477 to 87 goes through all the reliance in great detail that entities make on these parameters, and the Pinegate renewables comments also talk about this, that you look at the parameters when you're trying to figure out what your strategy is going to be in terms of how much quantity you're going to offer into the auction, and that's because it helps you predict what the price is going to be, and that's very relevant to a consideration of whether you want to take on risk that comes with offering and being selected to provide capacity to the market. Thank you. All right, thank you. We'll hear you on rebuttal. Thank you. Good morning, Your Honors. May it please the Court. Jared Fish for the Federal Energy Regulatory Commission. PJM made a filing with FERC in order to ensure that consumers in a small market would not incur $100 million in excess charges that are not necessary to meet reliability needs. That change was prospective, not retroactive in nature. My friend on the other side says that procedures were redone, that things that had already occurred were executed again. That is wrong as a matter of fact, and we do get deference for our reasonable factual determinations and our reasonable interpretations of the tariff. The posting requirements that my friend discussed in Section 5.10, it required PJM to post the reliability requirement it calculated by a certain date, August 2022. Changing the rule later on, the tariff amendment, did nothing to alter the legal effect of PJM meeting that posting deadline. It met the posting deadline under the tariff as it was written. Weren't the procedures retroactive then? I mean, if we move forward, they posted like the LDA reliability requirements. Now it keeps moving and then it goes back. I mean, isn't that retroactive? No, Your Honor. They posted the LDA reliability. Tariff is pretty specific, isn't it? The law of retroactivity depends on altering the past legal consequences of past actions, not the future legal consequences. That's Landgraf, right? That's Landgraf, but it's also filed rate cases. The Public Service Commission Louisiana case versus FERC, which we cite at page 27 of our brief, that was a FERC case, a filed rate case, a public utility case, and there the court rejected a retroactivity claim. So if I could briefly discuss the details, a utility had incurred a sunk cost. That cost was amortized over a period of years. FERC changed the rule governing the rate effect of that amortization in the middle of the amortization schedule. And the argument on retroactivity was, wait a minute, you already set the rule that would govern the rate effect of amortizing that past cost. So changing it now is retroactive. You're changing the procedure that has applied. And the court said, no, that's a misunderstanding of retroactivity because it only applied to amortization costs recorded going forward, not going backwards. So FERC here in accepting the tariff amendment did nothing to change PJM's compliance with the posting requirement, which occurred in August 2022. Now, petitioners also argue, well, wait a minute, section 5.10 further states that this posted reliability requirement will be used in the forthcoming auction. But that's speaking to a future legal effect, not a past legal consequence. And so the question is, when the tariff amendment was adopted, did it apply to future actions or did it change the legal effect of past actions? It only applied to future actions, and Judge Freeman, I think you were getting at this point, because it was used to determine in the future the clearing price and capacity commitments for the 2024-25 auction. None of the procedures that occurred before were undone. They weren't, you know, the past legal effect of those procedures was not altered. As far as, so that's, I think, petitioner's first line of argument, section 5.10 and the posting requirement. Their second theory of retroactivity also fails, and that is that the algorithm presumably, we don't really know, but the algorithm presumably was run before the tariff amendment. Why don't we know? You seem to say it wasn't. PJM seems to say it was. It's not in the record, but for purposes of argument, I'm willing to cop to. Let's assume that the algorithm was run once. Petitioners are wrong as a matter of fact and as a matter of tariff interpretation that there are only circumscribed circumstances in which PJM can rerun the algorithm. As the market monitor explained and as we credited at JA 176 to 177, the algorithm is run multiple times in the normal course because it spits out different solutions. It's not just one solution with one algorithm run. Can I ask you a question? Your argument seemed to emphasize how sort of preliminary this all was, and I think your brief says that you didn't establish clearing prices, but yet you say that, hey, listen, it's going to be four times more possibly to the actual consumer. Doesn't it say that you did run your prices? How would you know that it would be four times more? Well, it's possible that that was the result of the algorithm, but here's another key point. Isn't that inconsistent, though? I mean, you're saying we didn't run anything, and then you're saying four times. Well, Chief Judge Figueres, I think there's a critical distinction between running the algorithm and the algorithm result and the result of the auction, which is the clearing price. And petitioners have no answer to our tariff interpretation. Section 6.2 of the tariff is clear. It states that after running the auction pursuant to Section 5.12, and 5.12 is all about running the algorithm, then PJM shall calculate clearing prices. There are two distinct steps. Petitioners try to conflate those because they want to say that the clearing price was already determined before the tariff amendment took effect because the algorithm was run. But the two things are not coextensive. But wouldn't the clearing price be, you know, wouldn't the RCO be constrained by the results of the algorithm when setting the clearing price? Well, Judge Freeman, as I said and as the market monitor explained, there are multiple runs of the algorithm in the normal course. So, yes, well, perhaps, ultimately, PJM is constrained. But there is nothing in the tariff that constrains PJM to just run the algorithm once unless, you know, unless it needs to account for price responsive demand or correct for errors. This is normally how it operates. And so all PJM did was say, OK, we are going to propose an amendment to our tariff so that the next time we run the algorithm in the future, going forward, we will have the benefit of that rule change. And by the way, that rule change was necessary to comply with the tariff itself. Section 5.12A states that the algorithm shall be run in a manner that provides the least cost to meet reliability requirements. Well, I have two points in that. First, that statement wouldn't make any sense if PJM didn't have the discretion to run the algorithm multiple times. I mean, the only way you'd know that you weren't getting a least cost result is if you ran it once, looked at, you know, looked at the outcome and then decided, OK, that doesn't comport with market logic, the capacity auction fundamentals, which is the point the market monitor made. I understand your point that the tariff says, you know, you have to run the algorithm a certain way, but it's referring to the algorithm that had been set and published. And so do you agree that the algorithm was changed after that with the approval of BERC? The algorithm, well, the way that PJM ran the algorithm was changed, yes. But that didn't retroactively override anything because the clearing price hadn't been set. This would be a totally different case, or might be a totally different case, if PJM had run the algorithm, posted the clearing price and said, this is the result of the auction, this is the clearing price, and then said, actually, we want to change our tariff because we don't think that clearing price, you know, is equitable. That might be retroactive because that might be changing the past legal consequence of the past action of posting and determining the clearing price in the first instance. But that didn't happen. What if they had posted the rate, but no power had yet changed hands? The product had not been delivered yet. There seem to be some arguments in here that as long as they haven't actually delivered the power, that nothing could be retroactive. That's certainly not our argument. And that comes from JA 102-103, paragraph 167 of the initial order, where we said it is not retroactive rate making if capacity commitments and the clearing price have not already been determined. So that is, we're not prejudging a future case where there was a tariff change before delivery was made. But I would point out that there are FERC orders that petitioners actually seem to side with and then distinguish where we did make changes to tariff after the auction was completed. It affected the delivery obligations of capacity resources that had already received their capacity commitments where the clearing price was already set. And there was actually no petition for judicial review in either of those cases. Nobody seemed to think that that was retroactive rate making. So this is from JA 102. The commission said courts have held that changes to a rate are impermissibly retroactive only when regulated entities or customers have already transacted pursuant to the rate. And protesters point to no precedent in which a change to a rate or non-rate term has been determined to be retroactive before a transaction was made. And that seems to go, are you saying that here this goes farther than your current argument? No, not at all, Your Honor. That's a correct statement of fact that no court has found that where a transaction has not been consummated, there's retroactive rate making. That supports us. This is one step removed from that. This is an easier case. We continue in that paragraph saying that we conclude that a change to procedures is not retroactive if capacity supply obligations, including the right to a particular capacity price, have not yet actually been awarded. So all we're saying there is courts have gone further than this. They've said you actually wait until a transaction is consummated before there's retroactive rate making. We're saying this is an easier case, and I think it's telling. Petitioners can't point to a single decision where a transaction had not occurred and yet there was retroactive rate making. And Judge Restrepo, to your point on FERC's obligation to ensure just and reasonable rates, their aggressive interpretation of the filed rate doctrine, which no court has ever adopted, that would hinder our ability to satisfy that charge, that public trust charge, because it would mean that in a circumstance such as this, where some process, some amorphous definition of a process had begun, then neither a utility nor FERC could step in and say, we're going to potentially upset settled expectations in order to correct a deficiency going forward to ensure just and reasonable rates for consumers. I mean, consumers are on the hook here for potentially $100 million. Is the best way then just to clear the decks and start it over again the right way so at least your suppliers have an idea of what's happening? Well, I don't know that – it's unclear that that would make any difference. NRG, there's a statement in the record from NRG that, you know, they had already made out-of-market contracts. And so rerunning the auction might not solve the problem because then, you know, they were already committed to those contracts. I mean, is there a real danger here if – I mean, and, you know, there's a parade of horribles in the briefs. But, I mean, if FERC could always just change rules, I mean, people just can't back out. There are penalties that are pretty substantial. But it seems to be at FERC's mercy then, if we agree with you, that, you know, whether they'll change the rules midstream or, you know, change, you know, the different adjustments. Isn't that bad for the market? I understand the concern of Chief Judge, but history has borne out that that is not correct. Petitioners ignore the bevy of cases where we have granted rule changes after expectations have already been, you know, incurred after the auction. And the sky hasn't fallen. The capacity markets have maintained their integrity. That's at footnote 304 of J201. I can give you two examples, the ISO New England case that's cited in that footnote from 2014 and the PJM case from 2017. In both cases, the rule was changed actually after capacity obligations were already determined. And FERC said, well, weighing the benefits of the rule change to consumers against the avert settled expectations. Was retroactivity an issue there? I don't believe that retroactivity was an issue. But it was in the other cases that I mentioned, ISO New England, PJM from 2013 and 2014. But I think the key here is there were no changes to past legal consequences to past actions that PJM took. It posted by the deadline, posted the reliability requirement by the deadline, that nothing changed the legal effect of that posting. There was nothing that said, you know, actually the deadline was back in July. Oops, PJM, now you've missed it. You know, and there might be some liability for missing the deadline. No, the compliance with the deadline was preserved. The auction was open and closed in December of 2022. Nothing about changing the tariff amendment affected that. All the tariff amendment did was alter how PJM went about calculating the clearing price and capacity commitments for the first time. And I can't emphasize this enough. Petitioner's theory of the case depends on finding that, assuming the algorithm was run before the tariff amendment took effect, presto, the clearing price was already determined. And so by determining it after the amendment took effect, you're retroactively overriding what had already been found. And that, as a matter of fact, we said is not correct based on substantial record evidence and a reasonable interpretation of the tariff. I think I'm going to talk about what seems to be a fundamental disagreement about the standard of review. The petitioners rely primarily on SFPP. And can you explain to me what's going on in SFPP and whether it should apply here? SFPP does not apply here because while that was a filed rate doctrine retroactive rate making case, the court said we're not affording deference because FERC's decision is based on our prior decision. And FERC doesn't get deference for its interpretation of judicial opinions. And, you know, we readily acknowledge that. And so was it that in SFPP the decision was based entirely on a judicial opinion as opposed to, you know, I mean, the FERC quotes, cites judicial opinions all the time, right? So when does SFPP apply and when does it not? Well, SFPP applies. So the court there at PennSite 803 said, like FERC, we consider our prior decision. That's my bracket, our prior decision. Public Utilities Commission instructed as it addressed this precise issue in detail. So that's the standard. Every other case to consider the filed rate doctrine and rule against retroactive rate making has applied arbitrary and capricious review, and it shouldn't be a dispute here on what constitutes retroactivity. Because as I mentioned before, the Louisiana Public Service Commission case, that was a retroactive rate making case, that was a filed rate doctrine case, and the court applied precisely the rule that we advanced in our brief. Same thing with the Bell Atlantic Telephone Company's case that we also cite. That's a public utility case. It concerned a rule change that affected rates, and the court applied the land-grant factors. So something is either retroactive or it isn't. And, again, the test is whether the action has affected the past legal consequences, not the future legal consequences of past actions.  Thank you, Your Honor. And we'll hear from PJM's attorney. Thank you. Good morning. May it please the court. Lucas Walker for intervener, respondent, PJM Interconnection. The filed rate doctrine and the rule against retroactive rate making exist to support FERC's authority and responsibility to ensure just and reasonable rates. A theory that prevents FERC from doing that, even for future services that have not been delivered, under commitments, capacity commitments that have not yet been awarded, at a clearing price that has not yet even been determined, thwarts that responsibility. It would be an unprecedented expansion of the rule against retroactivity, and it has no support and precedent logic for the federal power. But what you say, doesn't it give FERC and CARP watch to do anything, as long as the final clearing rate hasn't been posted? I think in the situation of the procedures for a capacity auction like this, if it's prospective, if it's steps of that auction that have not yet happened and no capacity commitments have been awarded yet, I think in that situation there is the ability under the Federal Power Act to seek that prospective amendment. Now it is always, if I could just finish one thought, settled expectations will always be important, and I think once the capacity commitments are awarded, they're going to perhaps have paramount weight, but that is the restraint rather than a strict retroactivity bar. So I'd like to be clear about where you're asking us to draw the line, because I know that whether capacity commitments had been secured is, I imagine, is that equal to the announcement of the clearing rate? Yeah, when they're posted, that's the way that the capacity commitments are awarded. Okay, but what you mentioned a few moments ago was that, you know, there were additional steps to take in the process, and so there are steps to take in between where, you know, where things were placed on pause here and the announcement of the clearing rate. So where do you want us to draw the line? So I think FERC said that as long as the capacity commitments have not yet been awarded, that posting of the results, then it's not retroactive and it didn't need to go any further, and I think the Court doesn't have to go any further to uphold FERC's orders here. I might go just one step further and look to Section 511E in Attachment DD of the Tariff, and that says that after posting, there are some deadlines that PGM can correct errors, and if those deadlines pass without a relevant action happening, the tariff itself says those results are final. I think that would probably be the earliest you would say that we have a final, you know, administrative decision that retroactivity might then apply. So FERC can change any of the procedures until that final clearing rate has been posted and it's all done? I think if it's the procedures for determining the clearing rate, and the clearing rate has not yet been determined, then FERC can prospectively change the process that's going to be followed, always subject to the requirement that it needs to consider settled expectations that might have developed around the old rules. But the mere, someone's anticipation that the old rules are going to continue to apply is not a basis for finding a change to be retroactive. That's cases like Cox and this Court's decision in Pinhoe. Processes where aspects of the process were changed while the process was ongoing were found not to be retroactive because no final decision had already been made there. The inflection point from your perspective is when the price is posted. Well, I'd say five days after the price is posted is when the tariff says the results are final. That's probably the earliest that it could be. What happens before that is fair game. I think it is. And here we were well before that. So PJM is the entity responsible for making the final determination, and then after it makes that determination, posting them. And after the posting, they become final five or more days after that. And so we were in preliminary stages of trying to figure out what those final clearing prices should be. It's a very complex process that we have to follow. That's why we give seven days to do it. It's not, you know, the option offer window closes and we do it automatically just by pressing the button. Can I ask you something? If FERC does, and maybe even in this case, changes the LVA reliability rate, do they give notice to the people who put bids in to say, just an FYI, here's what we're doing? Or is everybody in the dark until it comes out and says, oh, yeah, we changed our parameters? No, this is full of, you know, the usual process that follows under Section 205 for great changes. The only thing that was different was because there was a threat of imminent severe economic harm to consumers. I'm just saying notice to the people who put in bids. Do they know that there's going to be a change in parameters? Or do they, you know, whatever was posted, they're assuming that that continues, and then at the end they find out, or maybe they never find out that the parameters changed. I don't know. Yeah, so the only reason the parameters – so the parameters have always been subject to adjustment for a variety of things even under the existing tariff, such as for economic efficiency and other things that FERC discussed. If parameters change, would FERC or you let bidders out? They say, hey, we're out. This doesn't make us feel comfortable. We don't want to do business here. Are they permitted to get out of the – basically abandon their bid? So in this situation, FERC found that it was not necessary to reopen the offer window, and that was, I think, well-supported for a couple of reasons. One, FERC found in its expert judgment that those – offers are supposed to be a competitive market, and so it shouldn't be increasing the offer because you think demand is going to be higher. It's supposed to be based on your cost of providing that capacity. And so FERC made an expert decision that because that is what's supposed to be determining what you're offering in, the prices and the megawatts you're offering, it wouldn't be necessary just when the parameter that's being changed is the demand curve, part of the demand curve, to reopen it. And it's also important to keep in mind what supply offers are, and that is the minimum price that the offeror is willing to accept for the capacity that it's offering. That's Section 5.6.1B, Romanette 1, and it says this is how much we're willing to get. And everyone got that. If they clear the option, they will get at least that amount, and many of them would have gotten more because everyone gets a clear price, even if it's more than what they offer. So that didn't change. So I participate in this auction under parameters, and then FERC changes the parameters, right? Can I withdraw my bid? In this situation, FERC found that that wasn't necessary because the bids should not – I can't. I'm bound by the parameters I bid on. Yes, but here FERC found that the parameter we're talking about, which is a measure of demand, really shouldn't be affecting what you are offering in where the price you're offering because those prices are supposed to be based on your own cost of production in a competitive market. It might actually be anti-competitive activity if you're bidding on something else and just trying to get the highest possible price. I think it's true that there's no record that shows anyone would have bid differently. Okay. Thank you, counsel. Thank you. And we'll hear from your friend. All right. So, Your Honor, if I may, I'd like to start with posting, and I'd like to look at the tariff language. It's on page addendum 55, the very top left corner of that page. I have two sheets printed out of mine. Top of that page. Process for establishing parameters of variable resource requirement curve. Subsection A. The parameters of the variable resource requirement curve will be established prior to the conduct of the base residual auction for a delivery year and will be used for such base residual auction. I don't, I mean, that doesn't get clearer than that. You post the parameters, which they did in August, and those shall be used for the base residual auction. Now, my opposing counsel at FERC says, well, it will be used in an auction. That's something in the future. I mean, come on. It says these parameters shall be used in the auction. And FERC and PJM decided, no, we're going to change that. We're going to use some different parameter. That is just the definition of retroactive. I don't think there's any, there can't be any question about that. Counsel for FERC cited the LPSC case. That found that the tariff allowed the adjustment that was being made. So FERC looked at the tariff and said, oh, no, the tariff allows this kind of adjustment. Remember that there is what's called the notice exception of the file rate doctrine. If the tariff itself says we can make adjustments going forward, then there's no file rate doctrine problem when you make those adjustments. And that's why, for example, PJM can make changes for price responsive demand or make changes to address market power. It can do that because the tariff in advance told everyone these are the kinds of adjustments that we can make later on. Here there's no argument that the tariff allowed the adjustments that PJM made. Otherwise, PJM wouldn't have had to come in with a Section 205 filing to change its tariff. It only needed to do that because the tariff didn't allow PJM to do what it sought to do. FERC also discusses the Landgraf case and the standard about retroactivity. We don't think Landgraf applies. That's from a different context. This is about a statutory test under the Section 205 of the Federal Power Act. But regardless, we meet the test. PJM undid our legal right to sell capacity under the tariff that existed at the time the parameters were posted and we submitted our offers. And it undid the past legal consequence of posting those parameters, which, again, the tariff says must be used in the auction. So this certainly retroactively changed legal consequences. Moving to the algorithm. I heard counsel from FERC say, oh, no, running the algorithm again is prospective because we can change the rules after we run it, and then the next time we run the algorithm, well, that's in the future. So they run the algorithm. Let's tweak the rules a little bit. Run it again. Oh, tweak the rules some more. Run it again. Tweak the rules some more. Run it again, all to get to the outcome that they prefer. That is, again, can you imagine any auctioneer ever doing that in an auction that anyone has experience with? That is the definition of retroactive. And if that's the way the system works, what's the point of having auction rules? There was a discussion about a tariff provision about lease cost. If you look at that tariff provision, it's 512 and appears on addendum page 62. It says that the optimization algorithm shall be applied to calculate the overall clearing result to minimize the cost of satisfying the reliability requirements, dot, dot, dot, while respecting all applicable requirements and constraints. In other words, it's not this freewheeling authority to just minimize cost, or, again, PJM wouldn't have needed the tariff amendment that it sought. You have to respect applicable requirements and constraints, and that's what PJM failed to do. There was a discussion about precedent. There's no appellate case on their side either. FERC's never done this before. This is new ground. And so he cites some FERC cases, but those were not challenged on appeal for whatever reason. They're not binding on this court. And the last point I want to make is about notice about changing of the parameters. We didn't know that FERC was going to do this or PJM was going to do this until they did it. There was no advance notice that this was the kind of thing that could be done,  The last word I want to say, Your Honor. Hold on. I'll give you a chance to finish, but when did you receive notice? At what point? Well, after the auction results were supposed to be posted, and then they weren't, PJM said, well, we're going to make a Section 205 filing to change things. Okay. And that's the problem. I mean, the whole thing is done by then, right? Our bids are in. I believe the algorithm was run, although, again, it doesn't matter because what matters is they didn't have discretion to throw in new conditions or new constraints. The last thing I just want to conclude on is remedy. So, you know, the delivery year starts June 1st. We know the Court has a busy docket. We would appreciate if there's any way the Court can issue a decision in advance of that date so this can get settled and clarified and resolved before the delivery year starts. That would be helpful for market certainty. And we'd ask the Court to vacate and remand with instructions for PJM to apply the algorithm that existed prior to the tariff change. Thank you very much. Thank you. We'll take this case.